## AFFIDAVIT OF GREGG WILLOUGHBY

I, Gregg A. Willoughby, Special Agent with the U.S. Drug Enforcement Administration ("DEA"), being duly sworn, depose and state as follows:

## I.   INTRODUCTION

1.       I am a Special Agent with DEA, part of the United States Department of Justice, and have been so employed for 22 years. I am currently assigned to the Boston Field Division's Cross Border Initiative Task Force in Lowell, Massachusetts ("CBI"), which consists of representatives from DEA and a variety of state and local law enforcement agencies, including the Massachusetts State Police; the Police Departments of Lowell, Lawrence, Wilmington, and Haverhill, Massachusetts, and Salem, New Hampshire; and the Essex County Sheriff's Department. As a Special Agent with the DEA, I am a law enforcement officer of the United States within the definition of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.       During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods they use to package, store, and distribute narcotics, and to conceal and launder drug proceeds. In addition, I have extensive experience investigating narcotics traffickers. Since joining the DEA, I have participated, both as a case agent and in a subsidiary role, in hundreds of narcotics-trafficking investigations involving cocaine, cocaine base ("crack"), heroin, marijuana, methamphetamine, oxycodone, Oxycontin, and other controlled substances. I have debriefed more than one hundred defendants, informants, and witnesses who had personal knowledge about the activities and operation of drug-trafficking organizations. I personally have participated in all aspects of narcotics-trafficking investigations, including conducting surveillance, using confidential informants,

acting in an undercover capacity, conducting court-authorized interceptions of wire and electronic communications, and preparing and executing arrest and search warrants.

3.      Based upon my training and experience, I am familiar with the manner in which narcotics traffickers operate, including the methods they use to distribute, store, and transport narcotics, and to collect, conceal, and launder drug proceeds. In particular, I am familiar with the manner in which they use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute drugs and drug proceeds. I am also familiar with the manner in which they use telephones, text messages, pagers, and other means of communication to facilitate their illegal activities. I know that drug traffickers commonly use coded words, slang, and specialized drug vernacular to disguise from law enforcement and from others the true meaning of their communications, especially communications occurring over wire and electronic communication facilities. I am familiar with the meanings of many of the coded and slang terms, and much of the drug vernacular based on my training and experience, particularly through interviews with drug traffickers and intercepted wire and electronic communications.

4.      I have participated in the below-described investigation since August 2014. During my work on this investigation, I have discussed the facts with agents and officers involved in this case and other related cases and reviewed relevant reports. I submit this affidavit based upon personal knowledge derived from my participation in this investigation and information that I have received orally and in writing from a variety of other sources, including law enforcement officers and agents, confidential sources, physical and video surveillance, and telephone toll records. Because this affidavit is being submitted for the limited purpose of seeking a criminal complaint against the below named individuals, I have not presented each and

2

every fact learned during this investigation; rather I have set forth only those facts and circumstances necessary to form the basis for the criminal complaint.

5.       I submit this affidavit in support of a criminal complaint charging Bernardino POLANCO-Sandoval, a.k.a. "Bernardino Polanco," a.k.a. "Prieto," a.k.a. "Negro" ("POLANCO") and Wellington TEJEDA, a.k.a. "Wellington Tejeda-Villa." a.k.a. "Alfredo Hernandez," a.k.a. "Luis A Reyes-Melendez" ("TEJEDA") (collectively the "Target Subjects") with conspiracy to possess with intent to distribute and to distribute heroin, a Schedule 1 controlled substance, in violation of 21 U.S.C. § 846. For the reasons set forth herein, I believe probable cause exists to conclude that the Target Subjects have committed this federal offense.

## II.    **BACKGROUND OF INVESTIGATION**

6.       In August 2014, a DEA cooperating witness ("CW-1")[1] began providing information to agents about a Dominican male, subsequently identified as POLANCO, distributing kilograms of heroin in greater Lawrence, Massachusetts. CW-1 was introduced to POLANCO by an associate who has provided information to DEA in the past ("Source of Information #1" or "SOI-1").[2] SOI-1 introduced POLANCO to CW-1 by phone in early August



1

2

2014. CW-1 only knew POLANCO by the nicknames "Negro" and "Prieto." During the next

few weeks, CW-1 negotiated to purchase two kilograms of heroin from POLANCO for $130,000

($65,000 per kilogram). However, on August 25, 2014, POLANCO told CW-1 that his heroin

supplier only had 1.45 kilograms available to sell to CW-1. CW-1 agreed to purchase the 1.45

kilograms of heroin from POLANCO the following day. On August 26, 2014, POLANCO,

TEJEDA, and            , another criminal associate not charged in the present complaint,

were arrested in Tewksbury, Massachusetts after POLANCO met with CW-1 to discuss

completing the deal. Agents seized approximately 1.5 kilograms of heroin from TEJEDA.

## III.    FACTS ESTABLISHING PROBABLE CAUSE

### A. Confidential Source Information

7.    In early August 2014, SOI-1 told CW-1 about a Dominican male nicknamed

"Prieto" and "Negro" (subsequently identified as POLANCO) who was involved in drug

trafficking in greater Lawrence. SOI-1 told CW-1 that he knew POLANCO from when SOI-1



4

was involved in marijuana distribution several years ago. About a week after SOI-1 first told CW-1 about POLANCO—SOI-1 introduced POLANCO to CW-1 during a telephone call that CW-1 recorded. During the call, POLANCO told CW-1 that he has had bad luck this year with his heroin business. POLANCO asked if CW-1 could supply marijuana. CW-1 said he could not supply marijuana, but could supply cocaine. CW-1 indicated that he had customers seeking heroin, but did not have a heroin supplier. POLANCO said that he could supply CW-1 with heroin—potentially more than two kilograms at a time.

8.     SOI-1 provided CW-1 with two telephone numbers for POLANCO and the license plate for POLANCO's vehicle. CW-1 then provided that information to DEA agents. CW-1 identified (978) 828-7609 as POLANCO's "work" phone number (i.e., the phone number he used to conduct narcotics trafficking) and (978) 893-9701 as POLANCO's personal-use phone number. CW-1 also identified Massachusetts license plate 778SH1 as the registration to a Honda CR-V used by POLANCO. SOI-1 told CW-1 that the Honda CR-V was owned by POLANCO's cousin, whose identity is unknown. According to Massachusetts Registry of Motor Vehicles records, license plate 778SH1 corresponds to a gold 2005 Honda CR-V owned by ██████ of ██████████, Lawrence, Massachusetts (hereafter, the "CR-V").

9.     CW-1 and POLANCO spoke by telephone on several occasions from August 8, 2014 to August 21, 2014 to discuss a potential purchase of heroin by CW-1 from POLANCO. POLANCO offered to sell CW-1 two kilograms of heroin for $65,000 per kilogram. The parties discussed other potential narcotics transactions as well. CW-1 recorded nearly all calls with POLANCO with the exception of a few calls in which POLANCO called CW-1 unexpectedly. In those instances, CW-1 told POLANCO that CW-1 would call POLANCO back, and CW-1 would record the subsequent call.

**B. August 21, 2014 Meeting Between CW-1 and POLANCO**

10.     On August 20, 2014, CW-1 spoke with POLANCO by phone, and the two agreed to meet the next day in person. CW-1 recorded the call.

11.     The following day, CW-1 and POLANCO agreed to meet at the TGI Friday's restaurant in "The LOOP" shopping center in Methuen, Massachusetts.

12.     Prior to CW-1's arrival at TGI Friday's, surveillance agents observed POLANCO and a Hispanic male later identified as ▮▮▮▮▮ in the CR-V, already parked in the lot at The LOOP. After CW-1 arrived at the TGI Friday's, agents observed POLANCO and ▮▮ drive the CR-V to the TGI Friday's lot. POLANCO exited the CR-V carrying a small child. POLANCO and the child entered TGI Friday's and met with CW-1 inside. The meeting between CW-1 and POLANCO on August 21, 2014, was consensually monitored and recorded.[3]

13.     During the meeting, POLANCO told CW-1 that his heroin supplier was located in Worcester, Massachusetts. During their meeting, POLANCO placed a call to the supplier in front of CW-1. POLANCO told CW-1 that the supplier was on his way to "the city," which CW-1 understood to mean New York City, but would return later that night. POLANCO explained that he could complete the heroin deal the next morning and that his supplier was also going to see if a "cousin" of his would be able to deliver the heroin to POLANCO and CW-1 later that day. POLANCO also told CW-1 that the quality of his supplier's heroin was good. CW-1 and POLANCO agreed to discuss the heroin deal further at a later time.

14.     After the meeting, agents followed POLANCO and ▮▮ in the CR-V to 78-80 Park Street in Lawrence, Massachusetts.

---

[3] The recording device recorded both audio and video. However, for most of the meeting, the camera was not positioned to capture POLANCO or his child.

### C. **August 25, 2014 Stop of POLANCO and Marte**

15.     On August 25, 2014, agents conducted surveillance of 78-80 Park Street in Lawrence, Massachusetts. Agents observed ▮▮▮ arrive at the residence in the CR-V and meet with POLANCO on the front porch. A short while later, POLANCO and ▮▮ left the residence in the CR-V with a young child. A uniformed Lawrence police officer stopped the vehicle for a seatbelt violation, as the young child was not properly secured in the vehicle. At that time agents affirmatively identified POLANCO and ▮▮. CW-1 subsequently positively identified a photograph of POLANCO as the individual with whom he was arranging to purchase the heroin.

16.     CW-1 continued to speak with POLANCO by telephone after the August 21, 2014 meeting. The calls between CW-1 and POLANCO were consensually recorded. On August 25, 2014, POLANCO told CW-1 that his heroin supplier had 1,450 grams of heroin available to sell to CW-1. CW-1 and POLANCO agreed to complete the transaction the following day.

### D. **August 26, 2014 Seizure of Approximately 1.5 kilograms of Heroin**

17.     On August 26, 2014, CW-1 and POLANCO spoke by telephone on several occasions to arrange to complete the 1,450 grams of heroin transaction. All of the calls between CW-1 and POLANCO on August 26, 2014, were consensually recorded, with the exception of one brief call in which POLANCO asked CW-1 for additional information regarding the meeting location.

18.     During one of the calls on August 26, 2014, POLANCO told CW-1 that he was waiting for his supplier to bring the heroin to him. In a later call, CW-1 and POLANCO calculated that the price for the 1,450 grams of heroin was $94,250.

19.     Surveillance agents observed ▇▇ and POLANCO depart 78-80 Park Street in Lawrence, Massachusetts, in the CR-V together. Agents followed POLANCO and ▇▇ as they drove around Lawrence, Massachusetts and eventually to an address on Forest Street in Lawrence. A short time later, agents observed POLANCO and ▇▇ depart that location in the CR-V.

20.     A short while later, CW-1 received a call from POLANCO, who told CW-1 that he was meeting with his supplier at the time. Moments after that call, surveillance agents observed ▇▇ and POLANCO park on a street in Lawrence. Agents then observed a silver Hyundai Elantra bearing Massachusetts registration 285NE7 (hereafter, the "Hyundai") pull over and park in front of the CR-V occupied by POLANCO and ▇▇. At that time, POLANCO exited the CR-V and met with the occupant and driver of the Hyundai, who was later identified as TEJEDA. After briefly meeting with TEJEDA, POLANCO returned to the CR-V and entered the passenger's side. At that time, CW-1 received a call from POLANCO. During the recorded call, POLANCO asked CW-1 where he was located. CW-1 directed POLANCO to meet him/her at the Home Depot on Main Street in Tewksbury, Massachusetts. POLANCO agreed.

21.     POLANCO and ▇▇ then drove in the CR-V, with TEJEDA following close behind in the Hyundai, to the Home Depot. TEJEDA parked the Hyundai in the center of the Home Depot parking lot, and POLANCO and ▇▇ stopped the CR-V near the Hyundai before moving to another area of the lot. A short time later, agents saw TEJEDA exit the CR-V carrying a black plastic bag that appeared to contain items of some weight and walk to the Hyundai. TEJEDA then drove off in the Hyundai.[4] Meanwhile, POLANCO exited the CR-V

---

[4]  Agents did not see TEJEDA exit the Hyundai and enter the CR-V. However, agents did see TEJEDA exiting the CR-V with a black plastic bag.

8

and entered the Home Depot and met with CW-1 inside.  Moments later, ▆ exited the CR-V,

walked to the opposite end of the store and remained outside.

22.      When POLANCO met with CW-1 in the store, POLANCO told CW-1 that his

supplier did not like the location and was reluctant to complete the deal at the Home Depot.

CW-1 told POLANCO that CW-1 only wanted to get a sample of the heroin there and that they

would complete the deal at a different location.  POLANCO agreed and told CW-1 that he would

call his supplier.  The undercover meeting between CW-1 and POLANCO on August 26, 2014,

was consensually monitored and recorded.[5]

23.      While POLANCO met with CW-1 in the store, agents followed TEJEDA.  As

they followed TEJEDA, they observed TEJEDA watching his rear-view mirror in a manner

consistent with attempts to identify the presence of law enforcement.  TEJEDA nearly drove into

a vehicle stopped in front of him on a couple of occasions.  A short distance away, TEJEDA

turned onto a side street and immediately conducted a three point turn to reverse direction.

Agents continued to follow TEJEDA as he drove in the direction of Interstate 495.  At this time,

agents and police officers stopped TEJEDA.  Because TEJEDA did not comply when agents and

officers instructed him to exit the vehicle, agents and officers physically removed TEJEDA from

the Hyundai.  TEJEDA was combative and resisted being handcuffed.  Once TEJEDA was

handcuffed, one agent observed the black plastic bag on the front passenger's seat of the

Hyundai in plain view.  The agent opened the bag and observed two brick-shaped objects

wrapped in clear cellophane and believed to be a portion of the heroin that CW-1 had agreed to

purchase from POLANCO.  While searching the Hyundai further, another officer discovered a

---

[5]  The recording device captured audio and video.  However, the camera was obstructed during
the encounter, and therefore did not capture images of POLANCO.

concealed compartment located under the rear passenger's seat.  The compartment was partially open and a third brick-shaped package could be seen inside.  This third brick was also seized.

24.    Shortly after TEJEDA was taken into custody and the suspected heroin was found, agents arrested ▇▇ and POLANCO at the Home Depot.  POLANCO was attempting to make a telephone call when agents arrested him inside the store.

25.    Each of the three brick-shaped objects wrapped in the plastic wrap weighed approximately 500 grams.  Each object also contained a compressed brown-colored powdery substance that field-tested positive for the presence of heroin.  The three brick-shaped objects wrapped in the plastic wrap and containing suspected heroin were sent to the DEA's Northeast Regional Laboratory for analysis; the analysis is pending.

26.    Agent's seized the cell phone that POLANCO dropped when he was arrested.  Later that day, I called (978) 828-7609; the same telephone number CW-1 called to talk to POLANCO, and determined that the cell phone seized from POLANCO was assigned that telephone number.  After having been advised of his <u>Miranda</u> rights, POLANCO told agents that he was brokering a 1.5 kilogram heroin deal between CW-1 and the driver of the silver car (TEJEDA).  POLANCO also stated that the price was to be negotiated by TEJEDA and CW-1 but would be between $65,000 and $70,000 per kilogram.

27.    During booking, TEJEDA placed a telephone call in the presence of a Spanish speaking agent.  During the call, the agents heard TEJEDA tell "Wendy" to get the "stuff" from under mattress and get out of the house.

28.    POLANCO, TEJEDA, and ▇▇ were charged with trafficking in heroin in violation of Massachusetts state drug laws and are currently in state custody.

## IV.   <u>CONCLUSION</u>

29.     Wherefore, I have probable cause to believe that POLANCO and TEJEDA

conspired to distribute and to possess with the intent to distribute heroin, a Schedule I controlled

substance in violation of 21 U.S.C. § 846.

I, Gregg A. Willoughby, having signed this Affidavit under oath as to all assertions and

allegations contained herein, state that its contents are true and correct to the best of my

knowledge, information, and belief.

<div style="margin-left:50%">

_____

Gregg A. Willoughby
Special Agent
Drug Enforcement Administration

</div>

Sworn and subscribed to before me this _____ day of September 2014, at Boston, Massachusetts

_____

The Honorable Marianne B. Bowler
United States Magistrate Judge
District of Massachusetts